SPRING VALLEY WATER CO. v. CITY AND COUNTY OF SAN
FRANCISCO et al.

(District Court, N. D. California, Second Division. July 13, 1918.)

Nos. 14,275, 14,735, 14,892, 15,131, 15,344, 15,569, Circuit Court; Nos. 26 and
96, District Court.

1. EQUITY ⚙≈409—FINDINGS OF MASTER—WEIGHT.

In a case involving the constitutionality of a state law, statutory or
municipal, the court will not be bound by the findings of a master.

2. WATERS AND WATER COURSES ⚙≈203(11)—WATER COMPANIES—VALUATION
OF PROPERTY.

Findings of a master as to the value of property used by a water com-
pany, and necessary for the furnishing of water to a city and its in-
habitants, and on which it was entitled to earn dividends, reviewed.

3. WATERS AND WATER COURSES ⚙≈203(12)—WATER COMPANIES—REGULATION
OF RATES.

A court is without power to revise rates to be charged by a water com-
pany as fixed by a municipal board within its authority, nor may it
enjoin their enforcement merely because they are deemed unjust or
unreasonable, but only on the ground that they are so low as to be clearly
confiscatory and unconstitutional.

4. WATERS AND WATER COURSES ⚙≈203(10)—WATER COMPANIES—REGULATION
OF RATES.

Earnings of 6 per cent. on the capital invested by a California water
company *held* a fair return, but ordinances fixing rates under which it
could not make such earnings *held* confiscatory and unconstitutional.

In Equity. Suit by the Spring Valley Water Company against the
City and County of San Francisco and others. On final hearing. De-
cree for complainant.

E. J. McCutchen, Warren Olney, Jr., and A. Crawford Greene, all
of San Francisco, Cal., for plaintiff.

George Lull, Robert M. Searles, and Jesse H. Steinhart, all of
San Francisco, Cal., for defendants.

RUDKIN, District Judge. For more than 60 years last past the
Spring Valley Water Company, a California corporation, and its pred-
ecessors in interest, have been engaged in the public service of sup-
plying the city of San Francisco and its inhabitants with water for
domestic and other purposes. To enable it to discharge the duties thus
assumed, the company has acquired lands and water rights, and has
constructed dams, reservoirs, pipe lines, and the usual facilities for
conserving, impounding, conducting, and delivering the water thus
supplied. Section 1 of article 14 of the state Constitution provides as
follows:

"The use of all water now appropriated, or that may hereafter be appro-
priated, for sale, rental, or distribution, is hereby declared to be a public use,
and subject to the regulation and control of the state, in the manner to be pre-
scribed by law: Provided, that the rates or compensation to be collected by
any person, company, or corporation in this state for the use of water supplied
to any city and county, or city, or town, or the inhabitants thereof, shall be
fixed, annually, by the board of supervisors, or city and county, or city, or

⚙≈For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

town council, or other governing body of such city and county, or city, or town, by ordinance or otherwise, in the manner that other ordinances or legislative acts or resolutions are passed by such body, and shall continue in force for one year and no longer. Such ordinances or resolutions shall be passed in the month of February of each year, and take effect on the first day of July thereafter."

Pursuant to this constitutional requirement the board of supervisors of the city and county of San Francisco, in the month of February, 1907, passed an ordinance fixing the rates or compensation to be charged by the plaintiff for the use of water for the year commencing on the 1st day of July, 1907, and ending on the 30th day of June, 1908, and in the month of February of each succeeding year thereafter, until and including the year 1914, a similar ordinance was passed fixing the rates or compensation to be charged for the use of water for the ensuing year. Soon after the passage of the ordinance of February, 1907, the plaintiff instituted suit No. 14,275 in the Circuit Court of the United States for the Northern District of California to restrain the city and county of San Francisco and the board of supervisors from enforcing the rates or compensation fixed by the ordinance, invoking the jurisdiction of that court on the ground that the rates or compensation thus fixed were noncompensatory, and that the ordinance took the property of the plaintiff for a public use without making just compensation therefor, and deprived the plaintiff of its property without due process of law, in violation of the Fifth and Fourteenth Articles of Amendment to the Constitution of the United States. Similar suits were instituted in the same court, and in the United States District Court, which succeeded to its jurisdiction in 1912, to enjoin the enforcement of the rates or compensation fixed by the ordinances passed in the ensuing years for the like reason. After the issues were made up the several cases were referred to the standing master by consent of parties, with directions to take the testimony and report his findings and conclusions to the court. The testimony has been taken, the master's report has been filed, exceptions to the report have been saved, and the case is now before the court for final disposition.

[1] At the threshold of the case the court is met with the objection that, inasmuch as the reference was by consent, the findings of the master are conclusive upon the court, unless there has been manifest error in the consideration given the testimony or in the application of governing principles of law. Kimberly v. Arms, 129 U. S. 512, 9 Sup. Ct. 355, 32 L. Ed. 764, Davis v. Schwartz, 155 U. S. 636, 15 Sup. Ct. 237, 39 L. Ed. 289, and kindred cases are cited in support of this proposition. That rule, however, has but a limited application to a case of this kind.

In Knoxville v. Knoxville Water Co., 212 U. S. 1, 7, 29 Sup. Ct. 148, 150 (53 L. Ed. 371), the court said:

"At the threshold of the consideration of the case the attitude of this court to the facts found below should be defined. Here are findings of fact by a master, confirmed by the court. The company contends that under these circumstances the findings are conclusive in this court, unless they are without support in the evidence or were made under the influence of erroneous views of the law. We need not stop to consider what the effect of such findings would be in an ordinary suit in equity. The purpose of this suit is to arrest

the operation of a law on the ground that it is void and of no effect. It happens that in this particular case it is not an act of the Legislature that is attacked, but an ordinance of a municipality. Nevertheless the function of rate making is purely legislative in its character, and this is true whether it is exercised directly by the Legislature itself or by some subordinate or administrative body, to whom the power of fixing rates in detail has been delegated. The completed act derives its authority from the Legislature and must be regarded as an exercise of the legislative power. * * * There can be at this day no doubt, on the one hand, that the courts on constitutional grounds may exercise the power of refusing to enforce legislation, nor, on the other hand, that that power ought to be exercised only in the clearest cases. The constitutional invalidity should be manifest, and, where that invalidity rests upon disputed questions of fact, the invalidating facts must be proved to the satisfaction of the court. In view of the character of the judicial power invoked in such cases, it is not tolerable that its exercise should rest securely upon the findings of a master, even though they be confirmed by the trial court. The power is best safeguarded against abuse by preserving to this court complete freedom in dealing with the facts of each case. Nothing less than this is demanded by the respect due from the judicial to the legislative authority. It must not be understood that the findings of a master, confirmed by the trial court, are without weight, or that they will not, as a practical question, sometimes be regarded as conclusive. All that is intended to be said is that in cases of this character this court will not fetter its discretion or judgment by any artificial rules as to the weight of the master's findings, however useful and well settled these rules may be in ordinary litigation. We approach the discussion of the facts in this spirit."

But in Chicago, Milwaukee, etc., Ry. Co. v. Tompkins, 176 U. S. 167, 180, 20 Sup. Ct. 336, 341 (44 L. Ed. 417), the court said:

"We are all of opinion that a better practice is to refer the testimony to some competent master, to make all needed computations, and find fully the facts. It is hardly necessary to observe that, in view of the difficulties and importance of such a case, it is imperative that the most competent and reliable master, general or special, should be selected; for it is not a light matter to interfere with the legislation of a state in respect to the prescribing of rates, nor a light matter to permit such legislation to wreck large property interests."

This ruling was reaffirmed in Lincoln Gas Co. v. Lincoln, 223 U. S. 349, 362, 32 Sup. Ct. 271, 56 L. Ed. 466, and it must be presumed that the court had this rule in mind in ordering the reference, and the parties in consenting thereto.

In this case the master examined the lands, reservoirs, and properties of the company, viewed other lands used as a basis of comparison for the purpose of fixing land values, heard the witnesses testify, observed their demeanor, and otherwise enjoyed opportunities for weighing and applying testimony which are denied to the court; and for that reason I must accept his finding as to the properties used and useful, and in general his findings on questions of land values, construction cost, depreciation, and expense of maintenance and operation, because such findings are amply supported by the testimony. But where the findings are in the nature of conclusions from undisputed facts I will be guided by my own conceptions of right and justice. In the light of these considerations I will refer, briefly as may be, to the findings relied on to support the conclusion of the master that the rates established by the board of supervisors for each of the several years in question are confiscatory and therefore void.

At the commencement of the trial the parties agreed that the case involving the 1913 rates should be deemed the principal one; that the value of the property and property rights of the plaintiff should be ascertained and fixed as of December 31st of that year; and that the value for the other years should be ascertained by deductions and additions to the inventory, aided by certain stipulated percentages. No objection has been urged by either party to the deductions or additions made to the 1913 valuation for the purpose of ascertaining and fixing the value for the remaining years, so that for the present we need only concern ourselves with the 1913 valuation. This statement, of course, has no application to the so-called Pleasanton Ranch Lands, which were not acquired until 1912. The master found that the value of all property of the company, used and useful as of December 31, 1913, was $39,000,000; that the net revenue for the year 1913–14, based on the ordinance of February, 1913, was $1,531,385.16, or 3.93 per cent.; and that a fair rate of return on the invested capital was 7 per cent. Speaking roughly, and without going into unnecessary details, the items going to make up the 1913 valuation are as follows:

| | |
|---|---:|
| Lands in the city of San Francisco | $ 1,015,290 00 |
| Merced watershed lands | 3,242,100 00 |
| Peninsular watershed lands | 2,027,649 00 |
| Miscellaneous peninsular lands | 278,381 00 |
| Alameda lands | 3,170,228 00 |
| Rights of way | 250,000 00 |
| Reservoir lands | 2,948,500 00 |
| Water rights | 3,060,000 00 |
| Structures, less depreciation | 18,737,000 00 |
| Partially constructed Calaveras dam | 514,304 00 |
| Inventory and working capital | 390,000 00 |
| Going concern value | 3,400,000 00 |
| Making a total of | $39,033,512 00 |

—which the master reduced to $39,000,000.

For reasons already stated, I adopt the finding of the master that all the above properties are used and useful. The finding is fully warranted by the testimony, and is further warranted, if not impelled, by the acts and conduct of the city and its representatives, extending over a period of years, in the matter of fixing rates, and in the condemnation suit instituted by the city to condemn the water system now in question. For the like reason I accept the valuations placed on the San Francisco lands, the Peninsular watershed lands, the Peninsular miscellaneous lands, the Alameda lands, the rights of way and structures, and the finding as to the necessary amount of working capital. The valuation placed on the reservoir lands seems somewhat fanciful and arbitrary, but I would not feel warranted in making a reduction that would make a difference in the final outcome of the case. The valuations placed on the other properties call for special consideration.

[2] First. As to the Merced watershed lands: Merced Lakes, containing an area of 336 acres, furnish at present a part of the city water supply. During the year 1913 the total water supply of the city from all sources was 39.7 million gallons daily, or 88 gallons per capita. Of this total 3.4 million gallons daily, or less than one-tenth of the

whole, was taken from the lakes in question. In addition to the ownership of the lakes the plaintiff owns 2,482.71 acres of adjacent watershed lands. The parties are not agreed as to the necessity for maintaining this watershed. The watershed lands are situated from 4½ to 7 miles from the civic center of the city, and are separated from the city by the range of hills dominated by the Twin Peaks. The lands are chiefly valuable for residential purposes, and the plaintiff contends that they cannot be safely used for these purposes so long as the water of the lakes is used for domestic purposes; that it will be necessary to abandon the use of the lakes as a source of supply for domestic purposes at an early date, and that thereafter the lake water will only be used in case of emergency. The defendants, on the other hand, contend that the maintenance of this watershed is unnecessary; that the water of the lakes can be adequately protected from pollution by the maintenance of a narrow margin or strip of land around the lakes. The master found that the maintenance of the watershed was necessary to protect the water of the lakes against pollution as long as the lake water is used for domestic purposes, and in that conclusion I concur. The question remains, however, what valuation should be placed upon these lands for rate-making purposes? The master found that the market value of the lands in the year in question was $5,532,231.50, but that for rate-making purposes the value was only $3,242,160, as already indicated. Both parties have excepted to the valuation thus fixed, the plaintiff contending for the full market value, the defendants insisting upon a still further reduction. Manifestly these watershed lands are not worth their full market value for rate-making or water-supply purposes; for if the lands are placed at their full market value of approximately five and one-half million dollars, and there is then added thereto the sum of $336,000, the value placed on the lakes for reservoir purposes, and the further sum of $315,000, the value placed upon the water rights in the lakes, the result is a capital investment of upwards of $6,000,000 for lands, reservoirs, and water rights, furnishing less than one-tenth of the total water supply of the city. It must be at once apparent that no such valuation can be considered or accepted. What valuation should, then, be adopted? In my opinion, the valuation fixed by the master is too high and unwarranted. If we accept his valuation of almost three and a quarter million dollars as of December 31, 1913, and add thereto the valuation placed on the lakes for reservoir purposes, and on the water rights in the lakes, we still have a capital investment of almost $4,000,000 for lands, reservoirs, and water rights, furnishing less than one-tenth of the total water supply, and this without dams, conduits, pipe lines, and all that goes to make up a complete system. In other words, on this basis the company would have upwards of $40,000,000 invested in lands, reservoir sites, and water rights alone, or more than the value of its entire system as found by the master. For the purposes for which these lakes and watershed lands are used, they are of no greater value than the lands and reservoir sites which go to make up the balance of the system. Indeed, they are perhaps of less value, because of the somewhat doubtful quality of the water furnished from this source.

If the use of these lands was necessary or indispensable to the maintenance of the system, a different question would be presented; for in that event the plaintiff would probably be entitled to a reasonable return on their full market value, whatever that value might be. But these lands are not indispensable to the maintenance of the system, and for water-supply and rate-making purposes are worth only the reasonable cost of obtaining an equivalent supply from an alternative source, which is conceded to be accessible. If it be said that the company is entitled to a reasonable return on the full value of these lands until water can be brought in from an alternative source, the answer is that practically the same conditions have existed for a long period of years, and the necessity for a change should have been anticipated and the change provided for. For these reasons I am of opinion that there should be a further deduction of $1,500,000 from the value of these watershed lands.

Second. As to the value of water rights. The master found that these water rights had a value of $90,000 per million gallons daily for the years 1913–14 and 1914–15 and a somewhat lesser value for the earlier years. If the water supply owned and controlled by the plaintiff was drawn from a stream or other definite source, I am not prepared to say that this valuation is excessive or unsupported by the testimony. But the San Francisco water supply is peculiar in this respect. As said by the master:

"There is no need of detailed description of the works. Unlike other localities, where water is available in adequate quantities from nearby rivers or lakes, San Francisco must rely chiefly upon the collection and storage of the winter flood waters of distant streams, whose flow largely diminishes or disappears during our rainless summers. This has required, in addition to the usual engineering structures needed for the diversion and distribution of water, the provision of large areas for impounding reservoirs, surrounding watershed lands to prevent habitation and its resulting pollution, and water rights to assure the ability to divert the water elsewhere."

Under such circumstances, to allow the company the full value of watershed and storage reservoirs, and add thereto the value of the water when collected and stored, is to place a double burden on the rate payers. The plaintiff is undoubtedly entitled to the full value of its storage facilities, but in addition to this it is only entitled to the fair value of the water rights in their natural state. And I am far from convinced that these winter flood waters flowing wildly to the bay and sea are worth $90,000 per million gallons daily, or even a small part of that sum. Of course all the water rights of the plaintiff are not of this character, but, making due allowance for its claims of every kind, I am of opinion that $1,500,000 should be deducted from the value of the water rights as found or fixed by the master.

Third. The next item is for construction cost of the Calaveras dam. The facts in relation to this partially constructed dam are these: Construction work commenced about 1910, or at least the first item of construction cost appears in the findings of the master for the year 1910–11. The master found that the dam should be completed some time during the present year or next year, unless construction work is delayed by the present war or other causes. When completed the

reservoir resulting from the construction of the dam will furnish forty-five million gallons daily to the city water supply, or more than the entire supply for any of the years in controversy here. The items allowed for this dam in the several years are, in round numbers, as follows:

| | |
|---|---|
| 1910–11 | $113,000 00 |
| 1911–12 | 154,000 00 |
| 1912–13 | 197,000 00 |
| 1913–14 | 514,000 00 |
| 1914–15 | 672,000 00 |

These several items are made up of the cost of preliminary investigations, engineering, construction work, and interest. It is conceded that these several sums were actually expended, and that the construction of the dam is a necessary addition to the water system; but it is likewise conceded that for the years now in controversy the dam added nothing to the city water supply. For this latter reason the defendants contend that the money thus expended should be omitted from property values for rate-making purposes. The plaintiff is entitled to a reasonable return upon its invested capital, and whether it receives that return from time to time as money is expended in the acquisition of property or in the construction of works, or whether it receives a higher rate of return when the works are completed and in use, to make up for interest and other charges during construction, is a matter of form rather than of substance. Perhaps the rule adopted by the master is the more equitable, because it obviates the necessity for any considerable increase in rates in any given year. The chief importance of the items, as I view them, is the bearing they have on the next item to be considered by the court, namely, the going concern value. I will therefore allow the items to stand, stating, as I did in regard to reservoir values, that their omission will not change the final result.

Fourth. The next item is the going value, or going concern value, of the plant or system, fixed by the master at $3,400,000. Such value is defined by the Supreme Court in Des Moines Gas Co. v. Des Moines, 238 U. S. 153, 165, 35 Sup. Ct. 811, 815 (59 L. Ed. 1244), as the value which inheres in a plant where its business is established as distinguished from one which has yet to establish its business. In further discussing the question in that case the court said:

"That there is an element of value in an assembled and established plant, doing business and earning money, over one not thus advanced, is self-evident. This element of value is a property right, and should be considered in determining the value of the property, upon which the owner has a right to make a fair return when the same is privately owned, although dedicated to public use. Each case must be controlled by its own circumstances, and the actual question here is: In view of the facts found, and the method of valuation used by him, did the master sufficiently include this element in determining the value of the property of this company for rate-making purposes?

"Included in going value, as usually reckoned, is the investment necessary to organizing and establishing the business which is not embraced in the value of its actual physical property. In this case what may be called the inception cost of the enterprise entering into the establishing of a going concern had long since been incurred. The present company and its predecessors had

long carried on business in the city of Des Moines, under other ordinances, and at higher rates than the ordinance in question established. For aught that appears in this record, these expenses may have been already compensated in rates charged and collected under former ordinances. As we have said, every presumption is in favor of the legitimate exercise of the rate-making power, and it is not to be presumed, without proof, that a company is under the necessity of making up losses and expenditures incidental to the experimental stage of its business."

It appears from the record that for a great many years last past the plaintiff has wisely anticipated its future needs, and has acquired property and rights long before there was an actual necessity therefor, and long before such property or rights were put in actual use. I also think it sufficiently appears that the value of the property and rights thus acquired was added to the value of the plant or system at the earliest opportunity, and that later rates were based thereon. At least there is nothing in the record to indicate the contrary. And the plaintiff now asserts the right to have the value of works under construction added to the value of the system, and to collect returns thereon, long before the works are actually completed or put in use, and we have a right to assume that the same course has been pursued in the past. For instance, in the case of the Calaveras dam, under the findings of the master the rates of the company will be based in part on money invested in the construction of the dam for many years before the dam is completed or put in use, and long before the rate payers derive any benefit therefrom. In the light of this practice, is it just or proper to add another percentage to the cost of the dam when put in actual use on the theory that it is then a going concern? It may be urged that the present value of the plaintiff's property does not depend upon past practices, and that such past practices cannot be taken into consideration, but, as said by the Supreme Court, every case is controlled by its own circumstances, and, under the circumstances disclosed by this record, I feel that past practices are a safer and more equitable guide than dogmatic theories and assumptions not justified by the record. No doubt the company has sustained losses by way of interest on investments in property and in construction work before receiving returns thereon, and probably losses in preliminary investigations and in establishing its business which have not been fully compensated for as operating expenses or otherwise; but, in view of all the circumstances, I deem the allowance of the master excessive, and deduct therefrom the sum of $2,000,000.

Fifth. Reference has already been made to the Pleasanton Ranch lands. For many years the company owned land in the vicinity of these lands, and pumped water for the system from the underlying gravel. These pumping operations lowered the water table under adjoining lands to such an extent that some time prior to the year 1912 the company was threatened with litigation by adjoining landowners. To avoid injunction suits or actions for damages, or perhaps both, the company deemed it advisable to purchase the lands outright and did so about the latter year. It thus acquired approximately 4,500 acres of land, at a cost of approximately $1,500,000. The value of these lands was included by the master in the rating base, and to such

inclusion the defendants have excepted. I am inclined to the opinion that the exception is well taken. However desirable the acquisition of these lands may have been from a business standpoint, the fact remains that they are not necessary to the maintenance of the system, and are not used or useful in connection therewith. It seems to me that the correct basis would be to ascertain as nearly as possible the value of the right or interest in these lands which is actually used for public purposes, and base the rate of return on that valuation. However, the master has allowed nothing for the water rights from these lands, and the rents and profits, amounting to about $40,000 annually at the time of the trial, have been accounted for as a part of the revenues of the system; and if the court should now undertake the difficult task of determining the value of the right or interest actually used for public purposes, and base the returns thereon, after deducting from the net revenues the rentals accounted for, the difference would be inconsiderable; at least, the difference would not be determinative of the case.

[3] Sixth. The master found that the plaintiff was entitled to a return of 7 per cent. on its invested capital during the several years in controversy here. If this is to be deemed a mere finding that such a rate of return was fair and reasonable as between the company and the water consumers, I have no comment or criticism to make. If, on the other hand, it is to be deemed a finding or conclusion that any less rate of return was confiscatory and violative of the Constitution of the United States, I must dissent therefrom. This court has no jurisdiction to review the action of the board of supervisors in the matter of fixing rates, and no jurisdiction to enjoin the enforcement of rates which are lower than the court itself would fix after full investigation. Any such attempt on the part of the court would be usurpation in its worst form. In Spring Valley Water Works v. San Francisco, 82 Cal. 286, 22 Pac. 910, 1046, 6 L. R. A. 756, 16 Am. St. Rep. 116, the court said:

"When the Constitution provides for the fixing of rates or compensation, it means *reasonable* rates and *just* compensation. To fix *such* rates and compensation is the duty and within the jurisdiction of the board. To fix rates not reasonable or compensation not just is a plain violation of its duty.

"But the courts cannot, after the board has fully and fairly investigated and acted, by fixing what it believes to be reasonable rates, step in and say its action shall be set aside and nullified because the courts, upon a similar investigation, have come to a different conclusion as to the reasonableness of the rates fixed. There must be actual fraud in fixing the rates, or they must be so palpably and grossly unreasonable and unjust as to amount to the same thing."

This language was quoted with approval by the Supreme Court in San Diego Land Co. v. National City, 174 U. S. 739, 750, 19 Sup. Ct. 804, 810 (43 L. Ed. 1154), and in the same case Mr. Justice Harlan said:

"But it should also be remembered that the judiciary ought not to interfere with the collection of rates established under legislative sanction, unless they are so plainly and palpably unreasonable as to make their enforcement equivalent to the taking of property for public use without such compensation as under all the circumstances is just both to the owner and to the public; that

is, judicial interference should never occur unless the case presents, clearly and beyond all doubt, such a flagrant attack upon the rights of property under the guise of regulations as to compel the court to say that the rates prescribed will necessarily have the effect to deny just compensation for private property taken for the public use."

[4] Cases may doubtless be found in which trial courts have found that public service corporations were entitled to a return of 7, or even as high as 8, per cent. on the capital invested in certain enterprises; but I have found no case where the court has held that a less rate of return than 7 per cent. is confiscatory or violative of the Constitution. A return of 6 per cent. was approved by the Supreme Court in Willcox v. Consolidated Gas Co., 212 U. S. 19, 29 Sup. Ct. 192, 53 L. Ed. 382, 48 L. R A. (N. S.) 1134, 15 Ann. Cas. 1034, and I think the concensus of opinion favors the view that such a rate of return is not confiscatory or violative of the Constitution. In Stanislaus County v. San Joaquin & K. R. C. & I. Co., 192 U. S. 201, 213, 24 Sup. Ct. 241, 246 (48 L. Ed. 406), the court had under consideration a California statute fixing the net annual receipt or return for furnishing water at not less than 6 nor more than 18 per cent., based on the value of the property used and useful. And in discussing the validity of such a statute the court said:

"It is not confiscation, nor a taking of property without due process of law, nor a denial of the equal protection of the laws, to fix water rates so as to give an income of 6 per cent. upon the then value of the property actually used, for the purpose of supplying water as provided by law, even though the company had prior thereto been allowed to fix rates that would secure to it 1½ per cent. a month income upon the capital actually invested in the undertaking. If not hampered by an unalterable contract, providing that a certain compensation should always be received, we think that a law which reduces the compensation theretofore allowed to 6 per cent. upon the present value of the property used for the public is not unconstitutional. There is nothing in the nature of confiscation about it."

The reasonableness of a return depends in a measure on local conditions, on the risks assumed, and other considerations. But it is a matter of common knowledge that interest rates vary almost as much in the same locality at different times as they do in different localities at the same time, and in an enterprise of this magnitude the question of locality, while entitled to consideration, is not controlling. At least, the Supreme Court did not so consider it in the case just cited arising in the same state. For these reasons I am of opinion that a return of as high as 6 per cent. on the invested capital or value of property devoted to the service of the public is not confiscatory, and violates no constitutional right of the plaintiff.

After a most careful and painstaking examination of the voluminous record before me, I do not feel that I would be warranted in making other or further changes in the master's report. Perhaps I might allow an item here or disallow an item there; but the changes would be inconsequential and of doubtful propriety. As said by the court in Cedar Rapids Gas Co. v. Cedar Rapids, 223 U. S. 655, 669, 32 Sup. Ct. 389, 390 (56 L. Ed. 594):

"An adjustment of this sort, under a power to regulate rates, has to steer between Scylla and Charybdis. On the one side if the franchise is taken to

mean that the most profitable return that could be got, free from competition, is protected by the Fourteenth Amendment, then the power to regulate is null. On the other hand, if the power to regulate withdraws the protection of the amendment altogether, then the property is nought. This is not a matter of economic theory, but of fair interpretation of a bargain. Neither extreme can have been meant. A midway between them must be met."

In the course of the opinion I have not referred to the voluminous exceptions taken, and this for obvious reasons. The exceptions reserved by the defendants are more than 100 in number, with subheads and subdivisions, and cover 57 closely typewritten pages. Many of the exceptions relate to reasons assigned by the master for his conclusions rather than to his findings on ultimate or material facts. Suffice it to say that in so far as the findings here made differ from the findings of the master the exceptions are sustained, but in all other respects the exceptions on the part of the defendants are overruled. Certain exceptions were reserved by the plaintiff, but all save one have been sufficiently answered. The plaintiff owns rights of way through Mt. Olivet, Cypress Lawn, Greenlawn, and Woodlawn cemeteries. The testimony tends to show that lands in these cemeteries are worth from $1 to $1.50 per square foot for burial purposes. The plaintiff insists that the rights of way through these cemeteries should be valued on that basis. In that conclusion I cannot agree. No such price was paid for the rights of way, and the mere presence of the cemeteries adds nothing to their value for water supply purposes. Certainly the fortuitous fact that pipe lines pass through these cemeteries adds nothing to the value of the system as a whole, and affords no reason why water rates should be based on the price the citizen is willing or compelled to pay for the six feet of earth that will mark his last resting place.

Much has been said by counsel representing the city about the original cost theory and its adoption by the California Railroad Commission. In answer to that argument it need only be said that the theory thus advocated has been repudiated time and again by the Supreme Court of the United States and the question is not an open one.

It remains to apply the conclusions thus announced to the facts of the several cases. Fortunately the court is relieved from one of the chief difficulties which usually arise in cases of this kind; that is, the return that may be expected under the regulations in question. No such difficulty can arise here, because the ordinance for each year expired with the year, the rates have already been collected, and the return is a mere matter of computation. The valuation fixed by the master varies from $32,900,000 in 1907–08 to $39,000,000 in 1913–14 and 1914–15. The net revenue varies from $696,648.74, or 2.1 per cent., in 1907–08, to $1,654,589.87, or 4.24 per cent., in 1914–15. The highest rate of return was therefore during the last year, and, if the ordinance for that year is declared noncompensatory and void, the same conclusion must follow in each of the earlier cases as a matter of course. The valuation for the year 1914–15 has been reduced from $39,000,000 to $34,000,000. A net return of 6 per cent. on that valuation is $2,040,000, or approximately $385,000 in excess of the ordinance rates. During each of the years in question a temporary re-

straining order was granted by the court, and the plaintiff was permitted to and did collect approximately 15 per cent. in excess of the ordinance rates. The actual net return during the year 1914–15, with this 15 per cent. added, was $2,011,903.97, or less than 6 per cent. on the valuation as found and fixed by the court. For these reasons I feel constrained to hold that each and all of the several ordinances are violative of the Constitution of the United States, and therefore void.

Let decrees be entered accordingly.