# EAST BAY WATER CO. v. McLAUGHLIN, Collector of Internal Revenue.

## No. 19254–S.

District Court, N. D. California, S. D.

Aug. 21, 1938.

T. P. Wittschen and L. W. Irving, both of Oakland, Cal., and John Enrietto, of Washington, D. C., for plaintiff.

Frank J. Hennessy, U. S. Atty., and Esther B. Phillips, Asst. U. S. Atty., both of San Francisco, Cal., and Milford S. Zimmerman, Sp. Asst. to Atty. Gen., for defendant.

LINDLEY, District Judge.

Plaintiff sues to recover additional income taxes assessed against it for the year 1928, arising out of the alleged profit made in the sale of its assets that year, the property having been acquired January 1, 1917. The Commissioner fixed the value at that time at the sum of $16,548,541, and, deducting this from the purchase price received, assessed the tax upon the resulting profit. The question here is whether the property was worth, on January 1, 1917, more than the sum found by the Commissioner, and if so, how much; for if the value shall be found to have exceeded that fixed by the Commissioner, then the profit resulting from the sale will be reduced by such excess and a refund become due. The only other question presented is as to the assessment of interest. Obviously the court is concerned primarily with the value of the assets acquired January 1, 1917.

On July 10, 1915, the Railroad Commission of California approved and adopted the opinion and order recommended by one of its members upon the application of plaintiff's predecessor, Peoples Water Company, for an order authorizing the transfer of its property to a corporation thereafter to be organized and the issuance of stocks and bonds by the latter corporation. It is obvious from the opinion and order that the purpose of the Commission in that proceeding was to determine what securities might with safety be issued as consideration for the taking over of the property of the Peoples Water Company. The Commission ordered that the property might be transferred to a new corporation in consideration of the issuance and delivery by the new corporation of bonds of the face value of $8,400,000 and capital stock of the par value of $8,640,000, or a total of $17,040,000. Thus the ultimate result of the proceeding was the approval by the Commission of the issuance of securities of the face value of $17,040,000 for the property of the corporation.

The Commissioner who made the recommendation and wrote the opinion concluded that the fair value of the property was $14,100,000. He added, however, the cautionary suggestion that the value found was one determined for the purposes of that proceeding only, and that it might very well be that a proceeding before the Commission to fix the just compensation which the public should pay for the property upon taking it over would result in a different figure.

Later, in 7 Cal.R.C. 787, the Commission said: "The Commission thus clearly stated that the value found was one for the purpose of the present proceeding only. It would be manifestly improper to make a finding in the present proceeding as to the value of the property for the purpose of some entirely different proceeding which has not been brought before the Commission. In a condemnation proceeding it may be necessary to consider certain elements of value which it was not necessary or proper to consider in the present proceeding, but for rate fixing purposes property not used and useful would not be included."

Included in the value of $14,100,000 was that of the land, $7,558,731.95, accepted by the parties in this proceeding. In determining the worth of the remainder of the property the writer of the opinion considered the plant, rights of way, water rights, going concern value, easements, filling over service pipes, and an added item of cost of wells. Each of these elements was discussed from the point of view of evidence submitted, including cost of reproduction new, the value of water rights and easements and property valuations determined by a capitalization of the earnings.

The Commissioner apparently relied chiefly upon the testimony of three witnesses, Cory, Hawley and Dockweiler, as to reproduction cost of the property, less depreciation.

Cory's valuation, undepreciated, was $9,843,470, and depreciated, $7,874,776; that of Hawley, undepreciated, $7,860,816, and depreciated, $5,245,168; that of Dockweiler, undepreciated, $8,133,607, and depreciated, $5,539,971. $945,000 of the difference between Cory and Hawley was found due to an allowance by Cory of that amount for paving over mains and surfaces actually done after the water pipes of the Company were laid. To this item the Commissioner refused to give any weight. The depreciation was calculated by Hawley, Cory, and Dockweiler upon the straight line method. Hawley submitted also a calculation of depreciation on the sinking fund basis, which resulted in a depreciation of $1,426,659 instead of $2,615,648. The Commissioner seems to have relied principally upon Hawley's evidence.

The Water Company there offered evidence as to the value of its water rights, consisting of rights acquired by prescription, through sinking of wells, pumping water therefrom, the building of collecting

reservoirs, acquisition of riparian rights and all other elements entering into the right to take, use, and sell water. There was then in production approximately 18,000,000 gallons per day, and the water rights as to these plaintiff insisted were worth $1,800,000 or $100,000 per million gallons per day. Plaintiff contended also that the water rights represented by the owned but undeveloped resources were worth $50,000 per million gallons daily, and that there were approximately 19,000,000 gallons daily of such, giving a total value of undeveloped water rights of $950,000, and a total for all water rights of $2,750,000. Though the Commissioner stated that plaintiff had submitted a sincere and carefully thought-out basis for determining the value of water rights, which would have been persuasive if he were not dealing with a public utility service, he failed to state how much weight he gave thereto, or how much of the total value was represented by water rights value.

The Commissioner discussed the element of going concern value. Plaintiff was there insisting upon $1,600,000 for this element. The Commissioner did not specify what he considered a reasonable allowance, saying his omission in that respect was due to the absence of reliable data. He asserted, however, that he had given consideration to the fact that the Company was a going concern, with a large number of customers.

It is very difficult to analyze the total valuation then approved by the Commission and to break it up into separate items. The fair conclusion, however, seems to be that in order to determine the value of the plant the Commissioner considered Hawley's cost new of $7,860,816, and that he probably arrived at the depreciation by averaging the calculation thereof under the straight line method and that under the sinking fund method, resulting in a net depreciation of $2,021,154, leaving a net value of the plant of $5,839,662. To this he added for easements $50,000; for filling over service pipes $60,000; additional cost of wells, $30,000; and for land $7,558,731.95. These items total $13,538,393.95. Inasmuch as the total value was fixed at $14,100,000 and the value of the properties mentioned was $13,538,393.95, the difference of $551,605.05 apparently represents the allowance of the Commission for intangibles, such as water rights and going concern value.

With the inventory submitted in that proceeding, both parties apparently start in this case. It is observed, however, that the valuation was determined in July, 1915, largely upon calculations as of January 1, 1915; that the opinion expressly recognized that if the public took the property, just compensation for the Company's assets might include additional allowances; that the value to be determined in the present instance is not that of 1915, but that of January 1, 1917, and that the Commissioner's later appraisement for the latter date was reached by including the additions to the plant between the two dates.

Plaintiff insists that the cost of materials entering into the construction of such property increased materially in the interim, and that the value should be re-determined as of the date January 1, 1917. On the other hand, the Government contends that there was no increase in the value of labor before January 1, 1917, and that inasmuch as it would require a period of approximately three years to build the physical property, the cost should be determined at the average prices prevailing over the three-year period preceding, rather than at the prices prevailing on January 1, 1917. The parties disagree also as to the value of water rights, going concern, and easements, and as to the method of depreciation and upon various other theories and details of evidence.

Three witnesses testified as to appraisals of the plant, basing their valuations largely upon calculated reproduction cost less depreciation.

M. E. Ready, an experienced and well-qualified engineer, testifying for plaintiff, said that there were large increases in prices of metal products between January 1, 1915, and January 1, 1917, and testified that the increases as shown by exhibits offered by him represented, in his judgment, the actual changes in costs of such products. Taking the inventory of 1915, calculating the cost of reproduction on January 1, 1917, as affected by the increase in prices of materials between January 1, 1915, and January 1, 1917, he arrived at an appraisement of $8,776,216.85 as the value of the plant after depreciation. Included was a figure of $725,405.25, representing the depreciated cost of paving over mains and services to the extent and in the amount that such pavement had been placed by others over such mains and services after the latter had been laid. The net figure was arrived at by the straight line method of depreciation. Using the sinking fund method, the witness found that the property had

a value as of January 1, 1917, of $10,859,-014.77, including the figure of $938,056.43 for depreciated cost of pavement over mains and services as above mentioned.

■ The first controversy between the parties as to this method of appraisement arises as to the element of cost of paving over mains after the latter were laid, the Government contending that this should not be included in computation of the reproduction cost. This court, under the recent decision of Erie Railroad Co. v. Tompkins, 302 U.S. 671, 58 S.Ct. 50, 82 L.Ed. ——, must look to the law of California for guidance. Whatever the Railroad Commission may have previously thought, in the comparatively recent decision, In re City of Redding, 39 Cal.R.C. 193, 196, it said: "With this property there is in place a considerable amount of paving in excess of that originally out and replaced. The Company included this directly in its reproduction cost figure, the City omitted it, and the Commission staff set it up as a separate item. There can be no question that it should be included in a reproduction cost estimate. Its effect upon value adhering in the property as of April 11, 1933, is, however, a matter of judgment as to the weight it would have upon the mind of a purchaser. It will be treated from that standpoint."

■ Consequently it seems to be the law in California that in computing the reproduction cost of a public utility property, cost of paving is properly included, even though the work was done by others subsequent to the laying of the mains. Consequently I have given it consideration in arriving at the reproduction cost and given to it such effect as I think it is entitled to in view of all the evidence in determining the ultimate question of value.

Mr. Hawley and Mr. Gillett testified for the Government. Mr. Hawley included $60,000 for the paving, and arrived at a value based upon depreciated cost of the plant of $5,454,396. Mr. Gillett accepted the Hawley appraisement, but allowed a weighted increase because of increase in prices in the amount of 7.3%, thus adding to the appraisement of Mr. Hawley the sum of $398,171, his calculated additional averaged increase of cost of materials between January 1, 1915, and 1917.

I am of the opinion that Mr. Ready was too liberal in his calculation of additional cost, and that Mr. Gillett was too conservative.

■ The witnesses differ also as to depreciation. Mr. Ready did not consider sufficiently the item of obsolescence, while the witnesses for the Government did not credit some of the property with sufficiently long life. Undoubtedly the increase in prices between January 1, 1915, and January 1, 1917, was more than 7.3%. Even in the absence of the testimony the court may take judicial notice that the increases were large, as the Supreme Court said in Missouri ex rel. Southwestern Bell Telephone Co. v. Public Service Commission, 262 U.S. 276, 43 S.Ct. 544, 67 L.Ed. 981, 31 A.L.R. 807, "as a matter of common knowledge." In that case, one witness estimated the increased costs as from 45% to 50%. Ready's testimony is that cast iron pipe increased from $31 to $45 per ton; 24" riveted steel pipe from $1.75 per foot to $2.30 per foot; ¾" standard screw pipe from 3½¢ per foot to 7¢ per foot; 2" screw pipe from 8¢ per foot to 16¢ per foot; 6" screw pipe from 47¢ per foot to $1.03 per foot. Metals generally, he said, raised from the point 83 to 183; building materials from 94 to 106. The parties were in discord as to whether there was an increase in the cost of labor, and a decrease in its efficiency in this period. The increase in cost of labor on the Pacific Coast during the period in question, if any, was slight, and it is impossible to define with any degree of certainty any lapse in efficiency. But the evidence is convincing that the cost of materials entering into the construction of the plant increased in a degree greater than Mr. Gillett added on his averaged basis.

■ The difference between the witnesses in this respect lies partly in Mr. Gillett's assumption that the increase in price should be spread over a period of construction of three years prior to the date of appraisement, whereas the plaintiff's witnesses insist that the increase in cost as of the date of completion establishes the measuring rod. True, the reconstruction of the plant would require time, but the pertinent valuation is that of the property in place on January 1, 1917, and the testimony was as to what it would cost to reproduce it as of that date. Consequently it seems to me that the only fair measure is the cost of materials and labor as of January 1, 1917. Therefore the testimony of the Government is of little aid to the court in solving the question of just how much the increase was. It was clearly in excess of 25%. Similar rulings have been made frequently. See

Bluefield Water Works & Improvement Co. v. Public Service Commission of West Virginia, 262 U.S. 679, at pages 689 and 692, 43 S.Ct. 675, at pages 677, 678, 67 L.Ed. 1176; Missouri ex rel. Southwestern Bell Tel. Co. v. Public Service Commission, 262 U.S. 276, at pages 287, 288, 43 S.Ct. 544, at page 546, 67 L.Ed. 981, 31 A.L.R. 807; McCardle v. Indianapolis Water Co., 272 U.S. 400, at page 408, 47 S.Ct. 144, at page 147, 71 L.Ed. 316.

■ In addition to the evidence of cost of reproduction less depreciation, each of the parties offered evidence as to valuation of the property based upon, first, a capitalization of. its earnings, and, second, the market value of its securities outstanding. Evidence of historical cost and various other elements, all competent and relevant in determining valuation, were submitted, and a formidable amount of testimony on both sides presented.

The parties differ as to the proper method of calculation of depreciation. In view of the fact that the Railroad Commission apparently gave consideration to both the sinking fund method and the straight line method, I have done likewise in considering the evidence, and after careful consideration of all the evidence, excluding that which is not properly authenticated or incompetent for other reasons, I conclude that the value of the tangible physical property of the plaintiff, other than real estate, on January 1, 1917, was $8,375,000.

■ The parties are in sad disagreement as to the value of the water rights. Plaintiff's witnesses testified to a valuation of $100,000 for each million gallons per day of developed water rights (of which there were about 18,000,000); and $50,000 per million gallons per day of undeveloped supplies, or a total of $2,720,500. The witnesses for the Government testified as to a minimum value of $340,000 and a maximum of $530,000. That consideration must be given to such water rights is evident from the decisions: San Joaquin & Kings River Canal & Irrigation Co. v. County of Stanislaus, 233 U.S. 454, 34 S.Ct. 652, 58 L.Ed. 1041; McCardle v. Indianapolis Water Co., 272 U.S. 400, 47 S.Ct. 144, 71 L.Ed. 316; Spring Valley Water Co. v. City and County of San Francisco, D. C., 252 F. 979.

The Government attacks the validity of some of the water rights claimed, but in view of all the evidence the court does not deem the objections sustained.

Again, I am of the opinion that plaintiff's witnesses were too liberal, and those of defendant too conservative in their estimates of the value of water rights. That they had value is admitted, but prior to 1917 it was contemplated that some of these rights should be superseded by various others. Considering all of the evidence bearing upon this subject offered by both parties, I find that the fair value of the water rights, both developed and undeveloped, on January 1, 1917, was $1,320,000. In reaching this conclusion I have valued the undeveloped water rights at one-third of the value of the developed price. While these rights had not been fully developed they had actual existence. They were property rights in the nature of chattels real, and plaintiff had a right to include them in the value of its property, though necessity for their enjoyment had not yet come into existence.

Two witnesses only testified as to the value of the intangible property rights of plaintiff comprised within the category "Easements,"—one for each of the parties. They were at wide variance. Considering their relative positions and qualifications, without discussing in detail the evidentiary facts, I find that the easements had a fair cash market value on January 1, 1917, of $120,000.

The Supreme Court of the United States, in City of Omaha v. Omaha Water Co., 218 U.S. 180, 30 S.Ct. 615, 54 L.Ed. 991, 48 L.R.A.,N.S., 1084, said (page 620): "The value, in equity and justice, must include whatever is contributed by the fact of the connection of the items making a complete and operating plant. The difference between a dead plant and a live one is a real value, and is independent of any franchise to go on, or any mere good will as between such a plant and its customers."

Again, in the later case of Des Moines Gas Co. v. City of Des Moines, 238 U.S. 153, 35 S.Ct. 811, 59 L.Ed. 1244, the court pointed out that there is a great difference in a monopoly which owns a business already developed and one that must develop it; that the plant there being considered had developed all its parts which were performing their several functions in serving the public and working in harmonious operation, and proceeded to say (page 815): " 'Going value' or 'going concern value,' i. e., the value which inheres in a plant where its business is established, as distinguished from one which has yet to establish its business, has been the subject

of much discussion in rate-making cases before the courts and commissions. Many of those cases are collected in Whitten on 'Valuation of Public Service Corporations' §§ 550–569, and the supplement to the same work §§ 1350–1385. That there is an element of value in an assembled and established plant, doing business and earning money, over one not thus advanced is self-evident." See, also, McCardle v. Indianapolis Water Co., 272 U.S. 400, 47 S.Ct. 144, 71 L.Ed. 316; Los Angeles Gas & Electric Corp. v. Railroad Commission of California, 289 U.S. 287, 53 S.Ct. 637, 77 L.Ed. 1180.

■ Consequently plaintiff rightfully contended that it should be credited with going concern value. Its witnesses testified to a value of $1,500,000 for this element. Defendant contends that it should not exceed 5% of the value of the other property. Plaintiff contends it should be at least 10% of such value. Numerous courts have approved allowances of 10% or more for the value of going concern. Taking into consideration the fact that further development work was contemplated at the time the property was purchased; that substantial value has been attributed to the water rights and avoiding the pitfall of any double allowance under the two categories, I fix the going concern value at $1,000,000.

■ Thus it will be seen that the value of the assets acquired of January 1, 1917, was:

| | |
|---|---:|
| Land (Stipulated) | $ 7,558,732 |
| Plant | 8,375,000 |
| Water rights | 1,320,000 |
| Easements | 120,000 |
| Going concern value | 1,000,000 |
| Total | $18,373,732 |

This is in excess of the value fixed by the Commissioner, $16,548,541 by the sum of $1,825,191, and by that amount and to that extent the Commissioner was in error, the tax excessive, and plaintiff's suit must succeed. The court, however, cannot fix the amount of the judgment, but must leave to the parties the matter of calculation and stipulation of the amount thereof. ·

■ I am not greatly impressed with the contention that the fact that plaintiff maintained its books in accord with the figures fixed by the Railroad Commission creates an estoppel. Book values may be some evidence of real values, but they are not binding or conclusive. Good-will and going concern value may have great value and yet not be reflected by the books at all. The same is true of easements, water rights, patents, and similar intangible property rights. But their inclusion in the book accounts at a certain value is little, if any, evidence of their true value, and their omission from the books does not estop the owner from claiming that which actually exists.

■ Nor am I able to say that the method of depreciation pursued by the plaintiff in its dealings with the Government subsequent to January 1, 1917, is to be taken as limiting it by way of admission or estoppel in determining the value in 1917. The question is not whether something was properly done after January 1, 1917, but what did plaintiff acquire on that date, and what was it actually worth at that time?

That the Commissioner did not consider the evidence as disclosing any admission against interest or estoppel is evident from the fact that his value was fixed considerably in excess of that recognized by the Railroad Commission. He evidently grounded his ultimate finding of value justly, as I think, upon the language of the Commission's opinion to the effect that it had considered the value for the purpose of determining what securities might safely be issued, and not to determine the value upon the taking of the property for public purposes.

■ Plaintiff contends also that the interest assessed against it was improperly calculated. Plaintiff filed its return for the year 1928 on July 15, 1929. August 12, 1930, the agent concluded that there was a deficiency in tax for the year 1928 of $579,726.90. September 4th following, plaintiff filed with the agent a waiver of its right to appeal to the Board of Tax Appeals and a consent to an immediate assessment and collection of the recommended deficiency. Thereafter, after interim proceedings before the Commissioner, on May 26, 1931, the deficiency was fixed by him in the sum of $571,271.60, some $51,544.70 more than that recommended by the agent. Plaintiff, on the same date, filed a second waiver, consenting to an immediate assessment of $571,271.60. This tax was paid by plaintiff on June 24, 1931. Interest was computed by the Commissioner on the total deficiency from March 15, 1929, the date the return was due, to June 24, 1931, the date of pay-

ment. Plaintiff insists the interest should have been computed as follows:

Interest on $571,271.60 from March 15, 1929, to October 4, 1930, the latter date being 30 days subsequent to the filing of the first waiver, and interest on $51,544.70 from October 4, 1930, to June 24, 1931.

Section 272 of the Revenue Act of 1928, 26 U.S.C.A. § 272, provides for an appeal from the Commissioner's determination to the Board of Tax Appeals. Subsection(d), 26 U.S.C.A. § 272(d), provides that the taxpayer shall, at any time, have the right by notice in writing filed with the Commissioner, to waive the restrictions provided in the subsection covering appeals, as to assessment and collection of the whole or any part of the deficiency. Section 292, 26 U.S.C.A. § 292, provides that interest shall be collected from the date prescribed for the payment of the tax to the date the deficiency is assessed, or in case of waiver under Section 272(d), to the thirtieth day after the filing of such waiver, or to the date the deficiency is assessed, whichever is the earlier. The Government contends that any waiver filed prior to the determination of an assessment by the Commissioner is premature and invalid, and that consequently the interest should be calculated as it was determined by the Commissioner on the entire amount of the deficiency to June 24, 1931.

The question has been decided adversely to the plaintiff by the Circuit Court of Appeals for the Ninth Circuit, in Mutual Lumber Co. v. Poe, 66 F.2d 904, certiorari denied 290 U.S. 706, 54 S.Ct. 373, 78 L. Ed. 606, and McCarthy Co. v. Commissioner, 80 F.2d 618, certiorari denied 296 U.S. 650, 56 S.Ct. 309, 80 L.Ed. 462. In the first mentioned case the court had before it a waiver filed before the Commissioner had made a formal determination of deficiency. The court said (at pages 906, 907):

"Section 274(a), supra (26 U.S.C.A. § 1048 [26 U.S.C.A. § 272(a)]), contains the initial and important condition, 'If in the case of any taxpayer, the commissioner determines that there is a deficiency in respect of the tax imposed by this chapter,' etc.

"This condition, set out at the very beginning of the section, assuredly qualifies all the other provisions contained in such section.

"One of those provisions is subdivision (d), § 274 (26 U.S.C.A. § 1048b [26 U.S.C.A. § 272(d)]), upon which the appellant chiefly relies. Reading that subdivision in the light of the foregoing condition specifically set forth in subdivision (a), we are impelled to the conclusion that the taxpayer's 'right' 'to waive the restrictions provided in section 1048 of this title [subdivision (a) of this section]' is qualified by the condition specified in the very subdivision (a) just referred to, namely, 'if in the case of any taxpayer, the commissioner determines that there is a deficiency in respect of the tax,' etc. If there is no determination of deficiency by the Commissioner, there is no right of appeal for the taxpayer to waive; for the provisional report of an internal revenue agent cannot be made the basis of an appeal. This is clear from the terms of the subsection itself, which computes the time allowed for the filing of a petition with the Board of Tax Appeals, not from the mailing of an agent's report but from the mailing of the Commissioner's notice of deficiency."

It was there insisted that it had been the practice of the Commissioner to allow waivers prior to assessment of deficiencies, and that the court should give heed to this practice in its determination. In reply the court said (at page 907): "Granting that such was the custom and that the practice of an executive department charged with administering a statute has great weight with the courts, such practice is not binding upon a judicial tribunal in the face of the plain terms of the statute."

In the case of McCarthy v. Commissioner, supra, the court adhered to its previous decision.

As a result of these two decisions the sub-committee of the Ways and Means Committee of the House of Representatives on January 14, 1938, said: "As a result of two decisions of the Circuit Court of Appeals for the Ninth Circuit (Mutual Lumber Co. v. Poe, 66 F.2d 904, 906, certiorari denied Jan. 8, 1934, 290 U.S. 706, 54 S.Ct. 373, 78 L.Ed. 606; McCarthy Co. v. Commissioner, 80 F.2d 618, certiorari denied Apr. 6, 1936, 298 U.S. 655, 56 S.Ct. 675, 80 L.Ed. 1381), a valid waiver cannot be given by a taxpayer prior to the formal determination by the Commissioner, as evidenced by a 60-or 90-day letter, that there is a deficiency in tax," and recommended that the statute be amended to provide that the taxpayer should have the right, at any time after a deficiency is proposed, to waive, by a signed notice in writing, any and all re-

strictions and stop interest; but no such amendment has been adopted. I feel impelled, in view of the language of the Court of Appeals, to conclude that the first waiver was premature and of no legal effect. The cases cited by plaintiff do not, in my opinion, militate against the force of this conclusion. The Commissioner followed the proper method in his calculation of interest.

The parties shall present a judgment in form and amounts to conform to this memorandum and the findings and conclusions filed concurrently herewith.