107 A.2d 786 (1954)
In the Matter of the Application of the DIAMOND STATE TELEPHONE COMPANY For Changes in Rates in Accordance with Section 151 of Title 26 of the Delaware Code of 1953.
Supreme Court of Delaware.
July 23, 1954.
Reargument Granted October 6, 1954.
*787 Max Terry, Dover, James J. Walsh, Wilmington, and Richard W. Case, Baltimore, Md., for appellant.
William S. Potter and Richard F. Corroon (of Berl, Potter, & Anderson), Wilmington, and John B. King and Paul Maloney, Philadelphia, Pa., for appellee.
WOLCOTT and TUNNELL, Justices, and CAREY, Judge, sitting.
TUNNELL, Justice (for the majority).
This is a telephone rate case.
Action was commenced on the company's petition to the Public Service Commission for a general upward revision of its intra-Delaware rates. The Commission took testimony, heard argument, and in due course entered an order granting an increase about one third as large as that requested by the company. The company appealed. Upon conclusion of the appeal proceedings, the Superior Court entered a judgment which resulted in a substantial increase over the rates allowed by the Commission.[1] The Commission sued out a writ of error, which has been duly argued and considered and is the subject of this opinion.
In approaching the ultimate issue, the Commission moved through several intermediate stages. It first made a finding of what the company could reasonably be expected to make under the rates then in force. It next determined what would be a fair percentage return for the company to enjoy upon the value of the property devoted to the public service. It then made a finding of the fair value of the property so employed and multiplied that value by what it had found to be the desirable percentage return. Finding that the prospective earnings under present rates were less than the amount it had determined to be fair, it entered an order authorizing the utility to prepare and submit new rate schedules which would increase the company's profits by a figure which the Commission held to be sufficient to cover this deficiency.
We find it convenient in this opinion to follow the same pattern of thought.
Prospective Earnings Under Old Rates.
In connection with the determination of anticipated earnings, two issues arose which have persisted to this appeal and which we must now consider.
*788 During the state's test period the company had made a number of donations to charitable causes, amounting to $3,653 for the entire year. The Commission refused to allow these gifts to be included as a business expense, holding that they must come out of the company's profits. The Superior Court reversed.
A real question may lurk here, as to whether the officers and directors of a utility have the right to commit it to substantial charitable undertakings and then simply to tax the consumers with the cost of their generosity. But in this case we are not brought to grips with the issue, for the amount of charitable contributions here involved was not enough to have any effect upon the rate schedule. Consequently, we shall not disturb the lower court's action in allowing these gifts as a business expense, but we shall refrain from either approving or disapproving what the learned judge said on the subject.
There is the further fact that during the test period selected by the state the company had received an income tax refund from the government in the sum of $15,700, being reimbursement for overpayment in some other year. The state insisted upon counting this refund as typical income, but the company called it a non-recurring item not properly includable in a study of anticipated earnings. The Commission adopted the state's view. The Superior Court reversed. We agree with the Superior Court.
We therefore concur with the Superior Court in respect to both the points of appeal which have to do with the Commission's method of projecting probable income and expenses.

Rate of Return.
There was no apparent issue as to the proper percentage rate of return. The company asked to be allowed rates calculated to produce a net annual return of 5.94% of the fair value of its property. This was to cover interest on its small indebtedness and such reasonable dividends to stockholders and increments to surplus as would keep the company's stock attractive from an investor's point of view.
There was no denial of the company's theory nor any criticism of the company's demand. Indeed, the Commission allowed 6.25%, so that, technically speaking, there neither was nor could be any complaint by the company as to this finding. However, the issue was brought into the case in another way.
Except for the war years, when taxes were too high to permit it, the company has long paid an annual stock dividend of $2 per share. This represents a return of eight per cent on the stock's $25 par value, and between seven and eight per cent on the book value. The company's policy of capitalizing its indebtedness makes it more difficult to pay generous dividends than would otherwise be the case, for the dividends it pays are at a higher percentage rate than interest and, in the bargain, are non-deductible for tax purposes. Nevertheless, the company rests its principal arguments for rates higher than those allowed by the Commission upon its asserted right to pay its "usual" or "traditional" dividend. And this position is maintained notwithstanding that until our 1949 Act (now, in amended form, Chap. 1, Title 26, of the Code) was passed, the rates of public utilities in this state were entirely unregulated except within the City of Wilmington, and the instant petition is this company's first application for a general revision of rates under the Act.
The company uses its dividend record, not as a reason for requesting a seven or eight per cent net return on the fair value of its property, plus something for surplus, but as an argument for a large rate base. It contends that its inability to pay its usual dividend under the rates allowed by the Commission automatically establishes that the Commission must have undervalued the company's property. The Superior Court's opinion adopted this view.
In deference to the company's chosen application of this argument, we shall not conclude it here, where one would expect *789 to find it treated, but defer it for later consideration.

Rate Base.
It is perfectly obvious that merely settling upon a percentage rate of return is of little value unless the figure by which it is to be multiplied is a sound one. It is at this point, the determination of what the Commission called the "rate base", that we encounter the most troublesome issue in the case. Both components of the rate base, the working capital requirements of the business and the fair value of the property, were in dispute.
We first take up the matter of working capital.
The company claimed that it needed to keep on hand at all times as cash working capital the average sum of $382,963 allocable to intra-state business. Its actual cash balances in the test periods, however, showed an average of somewhat less than $150,000, including funds allocable to interstate operations. The state's witness contended that this company needed no working capital at all, because a study of a Maryland company had shown that the customers paid their bills on the average of 23.2 days after rendition of service, while the company (owing to the fact that corporate income tax is not required to be paid currently) enjoyed a lag of 59.9 days. In the case of Diamond State, the average time lag between rendition of service and customers' payments was shown to be 26 days, but there was no testimony as to the interval between receipt of the money from the customers and payment of the company's debts including taxes.
Entirely upon the basis of this analogy with a Maryland concern, the Commission was urged to find that Diamond State enjoyed an average balance of $678,000 collected from customers but not yet paid out to creditors, and therefore required no allowance for working capital. The Commission adopted the view of the state's witness, but Judge Layton reversed and ordered the Commission to allow a working capital figure of $100,000.
Once again, we do not reach the underlying question, for the judge was right in his alternative holding that there was no competent evidence to gainsay the company's affirmative showing that it does require substantial working capital. The figures submitted in behalf of the state were based upon the experience of a different concern, and while there is some evidence of supposed similarity of that company's situation with this company's, and the question as to whether the state's testimony was at least circumstantial evidence is a close one, we think that on this question of evidence there is adequate basis for a direction by the Superior Court that an allowance be made for working capital.
Now we approach the larger question as to what is the "fair value of the property" within the meaning of Sec. 126 of our statute.
We need not consider the sharply controversial issue as to whether the Commission in fixing rates was forced to determine the fair value of the plant. The statute says that the Commission can do it that way, and it did, so the question of what else it might have done is moot.
The company pressed for a determination of fair value based entirely upon what it would cost to reproduce, equip, and supply its plant under present prices, adjusting that figure to allow for depreciation. On that basis it contended for a "fair value" of $28,700,000. The state, on the other hand, argued for a finding of fair value based entirely upon the amount of money the company had put into the plant, again, of course, making appropriate allowance for depreciation. The state's figure at the close of its test period was $19,766,643.
The Commission did not entirely adopt either view. It found a fair value for rate purposes of $22,000,000. This figure was multiplied by the 6.25% approved rate of return, and the Commission concluded that the company, in order to remain sound, should be allowed to make annual net earnings of $1,375,000. As above stated, this was more than the Commission determined that the company could expect to make under *790 present rates, so it entered an order authorizing the company to draw up a new rate schedule which would permit the company to increase its annual net revenue by $517,000 before taxes, that being the amount the Commission found to be required to bring the total net, after taxes, to $1,375,000.
The Superior Court, on the other hand, reviewed the history of rate cases and concluded that our statute falls within a well defined category of "fair value" statutes. Fair value, as the learned judge explains, in such statutes means "present" fair value. He found as a fact that there was currently a state of great inflation which "gives no indication of subsiding materially in the next few years." Thereupon he concluded that "A reproduction cost estimate is designed to meet the very situation here presented, and no other method, except original cost trended, which is about the same as reproduction cost, has been suggested which can deal with this problem."
Although the judge said that reproduction cost under the facts was entitled to "substantial" weight, what he did was to give it exclusive weight. He took the company's reproduction cost study, scaled it down about 10% in order to compensate for possible errors in the study, and fixed a fair value of $25,500,000.
The issue here drawn has been productive of long and bitter controversy. Cases can be cited for all shades of opinion between wide extremes. The first judicial reaction was that at any particular time it is fair and just to allow a utility a return based upon the then current value of the utility's property, with special emphasis upon current construction costs. Under this view, at a time of high prices and very high reproduction costs, the net profits after taxes would be correspondingly inflated. Any other view was thought to result in the state's taking property without just compensation, in violation of the 14th Amendment. This was the view set out in the line of cases interpreting and elaborating upon the famous dictum of Smyth v. Ames, 169 U.S. 466, 18 S.Ct. 418, 42 L.Ed. 819. See Willcox v. Consolidated Gas Company, 212 U.S. 19, 29 S.Ct. 192, 200, 53 L.Ed. 382.
But strong dissents and concurrences by Justices Brandeis and Holmes, often reiterated, constituted heavy assault upon this theory. In State of Missouri ex rel. Southwestern Bell Tel. Co. v. Public Service Commission, 262 U.S. 276, 43 S.Ct. 544, 547, 67 L.Ed. 981, Mr. Justice Brandeis said:
"The so-called rule of Smyth v. Ames is, in my opinion, legally and economically unsound. The thing devoted by the investor to the public use is not specific property, tangible and intangible, but capital embarked in the enterprise."
The force of the reasoning of these deep thinkers is apparent when one envisions the manifest injustices to which a regulated utility would be subject under the reproduction cost rule if it were required to ride a wave of deflation down to the trough.
Ultimately this widely fluctuating valuation rule was overruled in Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333. The Supreme Court determined that there is a sounder and more discerning principle of fairness which is incapable of reduction to any formula at all but which would simply require a reviewing court to look at the end result and decide whether a given schedule of rates could reasonably be said to be "just" both to the investor and to the consumer.
Although our statute was not enacted until five years after the Hope case was decided, Sec. 126 thereof contains passages obviously lifted from the famous dictum of Smyth v. Ames. Therefore, the learned judge of the Superior Court based his conclusion upon the very reasonable inference that even if the cases which purport to follow Smyth v. Ames, and which open the door to special emphasis upon reconstruction costs, have been overruled as statements of a principle of constitutional law, their rationale was here deliberately *791 incorporated into our statutory law, and until it is so applied as to run afoul of some constitutional restriction  a question not here presented  it must be respected.
We agree that the dictum of Smyth v. Ames itself was built into our statute, but we do not see that it furnishes any authority for ignoring all consideration of the amount of money which has been invested in a utility's plant and for confining consideration solely to reproduction costs under current prices.
As stated by Bonbright, The Problem of Valuation (1928), 41 Harv.Law Review, 564:
"To the ordinary reader, lay or professional, it would seem clear that if Smyth v. Ames settled anything at all it determined that cost of reproduction alone is not the `fair value' which is `the basis of all calculations as to the reasonableness of rates' to be charged by a public utility for its service. The Court held that to ascertain that value six things, including the `other matters' thrown in for safety, `are all matters for consideration,' and among these cost of reproduction was not given even first place. * * *"
And Mr. Justice Jackson's dissent in Federal Power Commission v. Hope Natural Gas Co., 64 S.Ct. 281, at page 300, an opinion to which the lower court referred with evident respect, says this:
"Certainly the theory of the court below that ties rate-making to the fair-value-reproduction-cost formula should be overruled as in conflict with Federal Power Commission v. Natural Gas Pipeline Company[2]."
Reference to the mass of authorities cited to us simply makes clear that we cannot reach out into the body of the law for our solution; we are driven back to a consideration of the ordinary meaning of the language of the statute. Interpolating the word "present" into the statute does not authorize us to spin out our own preferred or supposedly more logical definition of the concept of fair value; we must follow the wording of the statute taken as a whole. 26 Del.C. § 126, says this:
"In ascertaining and determining such fair value, the Commission may determine every fact, matter, or thing which, in its judgment, does or may have any bearing on such value; and may take into consideration, among other things, the original cost of construction, particularly with reference to the amount expended in the existing and useful permanent improvements; with such consideration for the amount in market value of its bonds and stocks, the probable earning capacity of the property under particular rates prescribed by statute or ordinance, or other municipal contract, or fixed or proposed by the Commission, and for the items of expenditures for obsolete equipment and construction, as the circumstances and the historical development of the enterprise may warrant; the reproduction costs of the property, based upon the fair average price of materials, property and labor, and the developmental and going concern value of such public service company; and these, and any other elements of value, shall be given such weight by the Commission as may be just and right in each case."
Perhaps the greatest difficulty here is the circuity of reasoning incorporated into the statute. The fair value of the plant is to be fixed by considering, inter alia, the rates the company will be able to charge, and the rates are to be set with the fair value of the plant in mind.
Obviously the statute authorizes the Commission to consider anything which it reasonably finds to bear upon the question of fair value for rate-fixing purposes.
The list of considerations suggested in the statute at once establishes that this statute was not designed to permit us to adopt in pure form either the reproduction cost rule *792 or the prudent investment rule, or, for that matter, any other fixed or definite standard. The above-quoted section directs that each of the suggested elements of value be given "such weight * * * as may be just and right in each case." Secs. 127 and 155, relating to rate fixing, require the rate to be "just and reasonable". If justice and reasonableness, or justice and right, are to guide us, the sad truth is that we are led out of the relatively clear-cut realms of law, logic, and economic formula into the shadowy field of ethics.
And where ordinary considerations of fair play are to be considered, it would be difficult to conceive of any set of circumstances in which the amount of money wisely and in good faith invested in a utility's plant would not be a factor of the first order of importance in fixing rates.
A limitation overriding and controlling any rule of mere historical fairness, however, is that it must be possible for the utility by prudent management to keep itself always prepared to render good service. This means that it must be able to expand its facilities into new territory and improve its service in the old. It must be financially prepared for the replacement of outmoded installations at whatever prices will have to be paid.
But this does not mean that there is a vested right to achieve all growth and to keep abreast of all technological advances entirely out of profits. It will satisfy the requirements of public policy, and of fair play as well, if the investment is maintained in a condition to attract new capital as needed. Therefore, the costs of keeping the plant modern must always be borne in mind in balancing the conflicting considerations which influence the fixing of rates. It will be an especially important factor whenever the reproduction or expansion costs are either substantially deflated or substantially inflated.
These are some of the considerations which must have led the General Assembly to confer such a wide discretion upon the Commission. And if this latitude results in a distressing void in respect to certainty, the saving grace, from a utilitarian point of view, is that the law allows pragmatic adjustment. Rate hearings are in that respect vastly unlike ordinary litigation. If the Commission makes a forecast which proves ill-founded, it not only can, but it must, make adjustment.
We find that the Commission was right in giving substantial weight both to original cost and to reproduction cost. This brings us to the question of the nature and extent of the Superior Court's duties in such a case.

Superior Court Powers on Review.
Judge Layton was impressed by the language of 26 Del.C. § 192(b), defining the right of appeal to the Superior Court. That section reads in part as follows:
"(b) Upon every appeal the cause shall be determined by the court from the record (which shall include a typewritten copy of the evidence and of the findings and order and opinion, if any, of the Commission) without a jury, and the court may affirm, modify or revise the order of the Commission, in whole or in part, or may remand the cause to the Commission for rehearing, in whole or in part. * * *"
The judge took this language to confer "very broad powers" upon the Superior Court. By this he appeared to mean powers broader than the familiar powers of a reviewing court. Since the Commission alone sees and hears the witnesses, and since the powers of the Commission are to such a large extent administrative rather than judicial, and since the Commission has the power to make pragmatic adjustments, we should in any case have been strongly disposed against too-ready intervention by the Superior Court. But it is not necessary to rely upon latent grounds; there is an apparent one which is dispositive of the point.
The instant statutory language is essentially the same as that in the statute governing appeals from orders of the Workmen's *793 Compensation Commission, 19 Del.C. § 2350 (b), which reads in part as follows:
"(b) In case of every appeal to the Superior Court, the cause shall be determined by the Court from the record, which shall include a typewritten copy of the evidence and the finding and award of the Board, without the aid of a jury, and the Court may reverse, affirm, or modify the award of the Board, or remand the cause to the Board for a rehearing."
The disinclination of the Superior Court to be drawn into a retrial of the merits of workmen's compensation cases is, of course, well established. See Wright v. American Shoe Company, Del.Super., 90 A.2d 681, 684, and cases therein cited. In our judgment, therefore, the rule which has been applied in workmen's compensation cases is the rule which governs the present case.
This laconic comment from the majority opinion of the Supreme Court of the United States in the Hope case, 64 S.Ct. 295, is appropriate:
"Apart from the requirements of judicial review it is not for us to advise the Commission how to discharge its functions."
In short, the duty of the Superior Court in these cases is to sit as a reviewing court, not as an administrative agency of superior rank.
We have already seen that the Superior Court erred in its conception that 90% of the reproduction cost as computed by the company (the reduction being made in order to compensate for errors inherent in the company's reproduction cost study) could properly constitute the sole basis for valuation under the statute. It is apparent on the face of the Commission's record that both original cost and reproduction cost were given substantial weight by the Commission. It, therefore, became the judge's duty to sustain the Commission, and not to fall into the mistake of substituting his views for the Commission's merely because, as he found, it "gave excessive weight to original cost and only minor recognition to reproduction cost", unless he found that the Commission had missed the mark so widely that its order constituted abuse of discretion.
The present record, of course, furnishes no basis for a judicial finding of abuse of discretion by the Commission. In the vaguely composite consideration for which our statute calls, the value of the plant was increased by more than two million ($2,000,000) dollars on account of the element of inflated reproduction costs. Perhaps the judge's judgment is as good as the Commission's, and it may be better  that delicate matter, happily, is not for us to pass upon , but there is no justification for a holding that the Commission's findings constitute a breakdown in administrative judgment.
The company makes much of its prediction that even if the full increase it requested were granted, by 1955 it would be able to add to surplus after the "usual" dividend less than the amount required to pay one quarter's dividend. We have previously referred to the curious way in which this dividend argument was brought to bear. The percentage rate which this dividend represents rather fails to harmonize with the 5.94% return on the fair value of the plant for which the company itself asked or the 6.25% rate which it was granted. The inconsistency would be more patent if, for example, the entire plant were new. In that situation certainly no one would talk of paying an eight per cent dividend on six per cent profits. And in the case of Diamond State the situation in 1955 will probably involve $10,000,000 in new plant.
As resolute as we must be in the public interest to provide conditions under which a utility can keep itself economically sound, we are unable to hold that an annual return of 6.25% after taxes, on a value more than 10% above book is so unreasonable on its face as to justify setting it aside in review proceedings.
*794 Nor can we see any basis for the company's evident fear that the terms of the Commission's order will work a grave hardship. If the Commission's ruling should eventually prove to be based upon an error in judgment, and if, with careful management, the rates do not make possible a fair dividend and a reasonable increment to surplus, the company will be fully protected  presumably by the Commission, but if the Commission should refuse, then by the courts.
Some degree of confusion throughout the case has resulted because the testimony was taken in the early stages of a large construction program which within three years is expected to increase the book value of the plant by almost 50%. The company's arguments about profits look forward all the way to the conclusion of this program. But an order would hardly be entered for 1953 which would not become "just and reasonable" until 1955. The company's own argument for stressing the "present" fair value would preclude such a result. The necessity for more than one application for an increase in rates is perhaps regrettable, but it is indicated under circumstances contemplating such drastic fiscal changes to be put into effect over such a considerable period. It is not easy to predict the immediate future and, of course, much more difficult when the date in question is remote. In the meantime, among a multitude of future uncertainties, it remains to be seen whether the company will complete its proposed program of expansion according to present plans or according to curtailed or expanded ones.
Nor is the reason which the learned judge gave for intervention a reason which we are able to endorse as the basis of a salutary rule for future guidance. He did it to save time. In respect to a single cause, the Superior Court's assumption of the Commission's prerogatives does appear to hold out the possibility of saving time. In the broader view, however, time is saved when litigation is brought to an end in the lower courts. For the Superior Court to amend findings simply because it would have made different ones would not only be a misapplication of the law but would tend to reduce hearings before the Commission to the status of mere rehearsals. The true rule saves time in the long run.

Majority Conclusion.
We conclude that the Superior Court was right in remanding for the correction of various errors[3] in the Commission's calculation of income, but that it was wrong in taking over the functions of the Commission and making its own "independent valuation" of the plant and its own determination of how much working capital was required. In the former respects its judgment will be affirmed, and in the latter ones it will be reversed. The Commission's valuation of the plant should have been allowed to stand, and the Commission should have been directed to fix the allowance for working capital. The mandate will direct amendment of the judgment of the Superior Court so as to bring it into accord with this opinion.

Justice Wolcott.
We are authorized to say that if the present state of Justice WOLCOTT'S health permitted, he would write and file a dissenting opinion. In his judgment, the regulation of a monopolistic public utility is intended to achieve a just balance between the interests of the utility owners and the interests of the consumers, and this means that rates should be fixed at the lowest level which will provide earnings upon the present value of the utility plant in such amount as to permit the payment of dividends, addition to surplus, and financing of needed plant expansion. In his judgment, the record fully establishes the inadequacy for these purposes of the result reached by the Commission. He considers that the statute confers upon the Superior Court in such circumstance the power to correct the inadequacy of the Commission's result by making its own independent findings. He further considers that the result reached *795 by the Superior Court is more nearly "just and reasonable" because it comes closer to a proper balancing of the respective interests concerned.
NOTES
[1] Judge Layton's opinion is reported at Del.Super., 103 A.2d 304.
[2] 315 U.S. 575, 62 S.Ct. 736, 86 L.Ed. 1037.
[3] Including two found by the Superior Court and not appealed by the state.